**In re the Proposed Judicial Commitment of Dustee THOMAS, Mentally Ill.**

**No. C8-87-1047.**

Court of Appeals of Minnesota.

Aug. 4, 1987.

Jeffry S. Rantala, Hibbing, for appellant Dustee Thomas.

Alan L. Mitchell, St. Louis Co. Atty., Gayle M. Goff, Asst. Co. Atty., Virginia, for respondent.

Considered and decided by POPOVICH, C.J., and FOLEY and HUSPENI, JJ., with oral argument waived.

## OPINION

POPOVICH, Chief Judge.

Dustee Thomas appeals the judgment of the trial court finding him to be a mentally ill person and committing him to Moose Lake Regional Treatment Center. We affirm.

## FACTS

Dustee Thomas was arrested in January 1987 upon the complaint of his father, Robert Thomas. The son had gone to his father's house and an altercation occurred which included an assault on the father. Dustee Thomas was evaluated by psychiatrist Allan Roberts, who concluded younger

Thomas was unable to fully understand the criminal proceedings or to cooperate with preparation of his defense.

Robert Thomas petitioned for commitment of his son and a hearing was held on that petition on March 4. Dr. Roberts testified at the hearing. Based on his daily contact with Dustee Thomas, review of medical records, and a conversation with the elder Thomas, Dr. Roberts concluded the proposed patient suffered from a schizophrenic disorder of a paranoid type.

While hospitalized awaiting the commitment hearing, Dustee Thomas isolated himself from other patients, talked to himself frequently, denied all mental illness, and refused medications. Psychological testing was unsuccessful and indicated deliberate evasion. Dustee Thomas openly spoke of his persistent belief that people entered his apartment while he was out and stole things or planted listening devices. His delusions focused upon his father, whom he believed to be responsible.

Based upon the extensive delusions, evidence of possible auditory hallucinations, the serious deterioration of Dustee Thomas' level of functioning, and his total lack of insight into his problems, Roberts recommended placement in a hospital setting for treatment. Roberts testified it was "imperative" that psychotropic medications be tried, and recognized that the proposed patient's refusal of all treatment efforts made involuntary hospitalization the only appropriate alternative.

Licensed consulting psychologist Craig Stevens was appointed to examine Dustee Thomas. He agreed Thomas suffered from a substantial psychiatric disorder. He did not perform any psychological testing and had little "substantiated" history of Thomas. Dr. Stevens diagnosed a paranoid disorder. (Dr. Roberts testified the chief difference between a paranoid disorder and paranoid schizophrenia is duration; when the condition persists for longer than six months, paranoid schizophrenia is indicated.)

Dr. Stevens also related Dustee Thomas' extensive delusions that his father was following him or hiring others to do so and "bugging" his apartment. Although Dr. Stevens suggested that other alternatives, short of commitment to a state hospital, be explored, he conceded the proposed patient's adamant refusal of all treatment and total lack of cooperation rendered all local facilities inappropriate. Dr. Stevens agreed that medications should be tried.

Dustee Thomas' landlady, Stella Bigo, testified next. Thomas had rented an apartment located above Bigo's garage from June 1986 until January 1987, when he was taken into custody. Thomas repeatedly questioned Bigo about imagined trespassers entering the apartment while he was out and he believed Bigo was talking with his father about him. Bigo testified Dustee Thomas would frequently yell out and make loud pounding noises for hours at a time when alone in the apartment. He isolated himself for periods of at least two weeks and would not leave the apartment.

Because of his repeated insistence that Bigo had let others into the apartment, she eventually became frightened of him and contacted county authorities. After Dustee Thomas was taken into custody following the incident involving Robert Thomas, Bigo discovered he had drilled holes in the door to his apartment and installed a padlock system. Inside, Bigo discovered a dozen holes in the plaster walls which appeared to be caused by a fist or kicks.

Robert Thomas testified his son had become increasingly irrational and incoherent over the past one and one-half years. He gave his son money approximately six times to change the locks on a previous apartment and paid for two additional padlocks. He knew his son believed others were going into his apartment and Dustee told him he had heard voices talking about spying on him.

In January 1987, events culminated when Dustee Thomas came to his father's home. Robert Thomas testified he listened to his son's complaints and suspicions for awhile and then his son swung at him with a heavy "boot box" in a plastic bag. Robert Thomas was hit twice and testified his son then took a knife from his pocket, opened

it, and threatened twice to kill his father. Robert Thomas also said Dustee threatened to cut his father's dog in half. (Dustee believed fleas from the dog had been planted in his apartment to spy on him.) The police were called.

Delores Thomas, Dustee's mother, confirmed that he had become increasingly irrational. She recounted how, on a visit to her home, Dustee had screamed for people to shut up when she heard and saw no one there and had also cut through a live cord to a television, blowing the set out. Dustee Thomas also insisted his mother's neighbors were talking about him.

Margaret Grahek, a St. Louis County social worker, testified she attempted to meet with Dustee Thomas several times upon the requests of Stella Bigo and Robert Thomas. When she eventually succeeded, Dustee Thomas denied all mental illness and refused voluntary treatment or services. Accordingly, Grahek recommended commitment to Moose Lake.

The proposed patient chose to testify in his own behalf. He explained that he had begun studying at a vocational school to become a diesel mechanic, but was forced to quit so he could stay in the apartment to protect it. He testified he had gone to his father's house in January to work on his car and brought the knife along for that purpose. He decided to confront his father concerning all the problems he believed his father "had created for [him]." He admitted swinging the box at his father but denied threatening him or the dog with the knife.

Dustee Thomas told the court that people were entering his apartment repeatedly, including his father. He claimed to have discovered fleas and dog hairs in the apartment and found money and food stolen and clothing destroyed. He insisted his father had admitted bugging his apartments. His explanation for refusing to leave the apartment in December and January was that he had a great deal of school work, although he also testified he had left school in November.

The trial court concluded Dustee Thomas was a mentally ill person and that he suffered from paranoia and bizarre delusions. The court found that mental illness had caused the January violent outburst directed at Robert Thomas. The trial court credited Robert Thomas' account of the outburst, noting that it "could not help but be impressed with [his] veracity and forthrightness." The trial court found the testimony of Stella Bigo and Delores Thomas confirmed the details of Robert Thomas' testimony and presented a coherent and consistent picture of Dustee Thomas' behavior.

In light of the recent violence directed at Robert Thomas and Dustee's repeated rejection of all efforts to obtain treatment, the trial court concluded there was no suitable alternative to involuntary commitment to the state hospital. This appeal followed.

### ISSUE

Is the trial court's finding that Dustee Thomas was a mentally ill person clearly erroneous?

### ANALYSIS

■ A trial court may order commitment of an individual as a mentally ill person if it finds (a) the individual has a substantial psychiatric disorder, (b) that the disorder is manifested by grossly disturbed behavior or faulty perceptions, (c) the individual poses a substantial likelihood of physical harm to himself or others as demonstrated by a recent attempt or threat of harm, and (d) there is no suitable less restrictive alternative to commitment. Minn.Stat. §§ 253B.02, subd. 13, 253B.09, subd. 1 (1986). In reviewing the findings of the trial court, this court must give "due regard * * * to the opportunity of the trial court to judge the credibility of the witnesses" and may not set aside the findings unless they are clearly erroneous. Minn.R. Civ.P. 52.01.

■ On appeal, Dustee Thomas does not challenge the diagnosis or the propriety of commitment to the state hospital. He argues only that there was insufficient evidence to support a finding that he posed a substantial likelihood of physical harm to

others. He claims the "sole evidence" of any attempt or threat of harm to others was the January incident involving his father and argues the lack of a corroborating witness renders his father's account unpersuasive. We disagree.

The trial court, which had the opportunity to evaluate the credibility of both father and son, believed Robert Thomas' account. The trial court specifically found Robert Thomas to be forthright. Dustee Thomas' own testimony confirmed that he blamed his father for his problems, hit his father with a box, had a knife with him, and believed his father's dog was somehow involved in the imagined bugging of his apartment. The mere fact that Dustee Thomas did not attack his father in front of witnesses does not render the father's testimony unbelievable.

The evidence before the trial court of Dustee Thomas' mental illness, his deterioration, and his accelerating frustration, culminating in physical violence towards his father, was sufficient to support the findings and the findings are not clearly erroneous.

### DECISION

The trial court properly committed Dustee Thomas to Moose Lake Regional Treatment Center.

Affirmed.